[No. 31482. Department One. March 29, 1951.]

EDWIN SHAY, *as Guardian ad Litem of Sharon Clark, a Minor, Respondent,* v. V. R. PARKHURST, *Appellant.*[1]

[1] Reported in 229 P. (2d) 510.

*Meier & Murray,* for appellant.

*Walthew, Gershon, Yothers & Warner,* for respondent.

DONWORTH, J.—Plaintiff, Edwin Shay, grandfather of Sharon Clark, a minor, brought this action as her guardian *ad litem* to recover damages sustained by the minor child on account of personal injuries alleged to have resulted from her falling out of the door of defendant's taxicab and for medical expenses incurred in connection with this accident. The case was tried to a court and jury. The trial resulted in a verdict awarding to the plaintiff recovery against the defendant in the sum of ten thousand dollars.

Motion for judgment notwithstanding the verdict, or, in the alternative, for a new trial was interposed by defendant and was denied. Judgment was thereupon entered on the verdict, from which defendant has appealed.

From evidence presented at the trial, the jury was warranted in finding the following facts:

On March 14, 1949, Sharon Clark, three and one-half years old, was in the care of Violet Taylor, a tenant in an apartment house owned by respondent in Bremerton. Mrs. Taylor desired to inspect an apartment to which she intended to move soon and about one o'clock p. m. called one of appellant's taxicabs for transportation to that place, which is about a ten-minute ride from respondent's apartment house.

Upon its arrival, Mrs. Taylor, Sharon Clark, and a friend, Mrs. Sumner, along with Karen Jackson (a three and one-half year old child who was in Mrs. Sumner's care) all entered the taxicab as fare-paying passengers. All four persons entered the cab through the right rear door. Mrs. Sumner sat on the left side of the rear seat, Mrs. Taylor on the right, Karen was seated in the middle, and Sharon was standing up directly behind the driver facing forward.

Mrs. Taylor testified that, when the taxicab started to move, she cautioned Sharon to sit down but that the driver

remarked, "It's all right; the doors are locked." (The driver denied making this statement, but the jury apparently believed Mrs. Taylor.) The taxicab proceeded at a lawful rate of speed for approximately one mile, during which two right turns were made at slow speeds. The first right turn was made upon emerging from an alley into the street, the second right turn was made after making a full stop at an arterial. Both women testified that during the trip there was no rattling of the doors and that there was no draft in the taxicab.

As the taxicab rounded the third right turn, the left rear door flew open and Sharon fell out through the doorway striking the pavement. The testimony showed that this turn was not a right angle turn but rather a "half moon" curve and that, in rounding this curve, the driver was not exceeding the lawful rate of speed. When the taxicab stopped, the child was lying by the left rear wheel of the vehicle. She was immediately picked up by Mrs. Taylor and taken in the cab to a hospital a block away.

No purpose can be served by detailing the injuries suffered by the child. There was sufficient evidence to warrant the jury in finding that Sharon had sustained substantial injuries as a result of the fall.

Mrs. Taylor testified that during the trip Sharon was not playing with the door. Mrs. Sumner stated that, as the taxicab turned the curve, Sharon had her hands on the back of the driver's seat and that when the door opened Sharon went through the doorway in spite of the witness' frantic attempt to catch hold of her.

Appellant's evidence showed that the taxicab, a 1947 four-door Dodge sedan, was driven approximately twelve hundred miles per week and was serviced by appellant's mechanic about every five or six days. It was part of the routine of the mechanic, in addition to oiling and greasing the doors, to check the doors and catches by closing them and pulling them hard to make sure they would not open by themselves.

The taxicab was checked by this mechanic approximately forty-five minutes after the accident and he testified that the left rear door and its locks were in perfect condition. The door operated without difficulty the remainder of the day. The taxicab driver also testified that the taxicab had been used to pick up a number of passengers on that day prior to the accident and that no difficulty with the left rear door was experienced.

The taxicab driver not only denied that he told Mrs. Taylor that it was not necessary for Sharon to sit down on the seat since the doors were locked, but stated, on cross-examination, that Sharon had touched the door in question before it flew open. The jury had a right to believe Mrs. Taylor's denial that Sharon touched the left door at any time (as well as her version of the driver's statement that the doors were locked), which it apparently did in each instance.

Sharon's stepfather, who was divorced from Sharon's mother at the time of the trial and who had been in appellant's employ, testified that the child had on at least two occasions previous to the accident opened the door of his automobile while it was stationary and had fallen out.

Appellant's first three assignments of error relate to the trial court's refusal to grant a directed verdict in his favor and the giving of instructions which submitted the case to the jury on the doctrine of *res ipsa loquitur*. Respondent was unable to prove any specific acts of negligence on the part of appellant which could be said to be the proximate cause of Sharon's injuries and, if the doctrine of *res ipsa loquitur* does not apply to the facts of this case, appellant's motion for a directed verdict should have been granted. It is, therefore, necessary to consider the applicability of this doctrine.

The doctrine of *res ipsa loquitur* received a very thorough analysis in our recent case of *Morner v. Union Pac. R. Co.*, 31 Wn. (2d) 282, 196 P. (2d) 744, in which the court stated:

"The doctrine of *res ipsa loquitur,* an expression which, literally translated, means 'the thing speaks for itself,' as

applied in this state and most jurisdictions is as follows: When the agency or instrumentality which caused the injury complained of is shown to have been under the exclusive control and management of the defendant or his servants, and the accident, or injurious occurrence, is such as in the ordinary course of events does not happen if those who have the control and management of the agency or instrumentality use proper care, the injurious occurrence of itself, in the absence of explanation by the defendant, affords reasonable evidence, or a permissible inference, that such occurrence arose from or was caused by the defendant's want of care. . . .

"This doctrine constitutes a rule of evidence peculiar to the law of negligence and is an exception to, or perhaps more accurately a qualification of, the general rule that negligence is not to be presumed, but must be affirmatively proved. By virtue of the doctrine, the law recognizes that an accident, or injurious occurrence, may be of such nature, or may happen under such circumstances, that the occurrence is of itself sufficient to establish *prima facie* the fact of negligence on the part of the defendant, without further or direct proof thereof, thus casting upon the defendant the duty to come forward with an exculpatory explanation, rebutting or otherwise overcoming the presumption or inference of negligence on his part. . . .

"The doctrine of *res ipsa loquitur* is based in part upon the theory that the defendant, having the sole and exclusive charge of the agency or instrumentality which caused the injury, knows the cause of the accident, or injurious occurrence, or has the best opportunity of ascertaining it, and should, therefore, be required to produce the evidence in explanation thereof, while, on the other hand, the plaintiff has no such knowledge and is, therefore, compelled to allege negligence in general terms and to rely upon proof of the happening of such occurrence to establish negligence. . . .

"With reference to the application of the doctrine, this court, in common with many others, has held that while the maxim, when properly applied, is of value in the administration of justice, its scope is nevertheless limited, and ordinarily it is to be sparingly applied, in peculiar and exceptional cases, and only where the facts and the demands of justice make its application essential."

For a further discussion of the doctrine, see *Nopson v. Seattle*, 33 Wn. (2d) 772, 207 P. (2d) 674, including Judge Hill's dissenting opinion.

Appellant strenuously argues that the doctrine is not applicable to this case because the instrumentality involved (left rear door) was not within the sole and exclusive control of the appellant, and, further, that the accident could have happened without negligence on the part of the defendant.

As the *Morner* case, *supra,* points out, it would be unjust to impose upon appellant in the instant case the burden of explaining how the accident occurred and showing that it did not happen through want of care on his part if, in fact, he did not have exclusive control of the instrumentality. The evidence with respect to exclusive control consisted of the undisputed testimony that all four passengers entered the taxicab through the *right* rear door. Sharon's custodian, Mrs. Taylor, testified that Sharon did not play with the left hand door. The cab driver testified that Sharon was moving around in the back of the cab, although part of the time she was standing up with her hands on the back of the front seat. The fact that Sharon and three other persons were in the back seat in a position to touch the left rear door does not preclude respondent from invoking the doctrine *if, in fact, the left rear door was not touched.*

From the evidence, reasonable minds might very well differ as to whether or not Sharon touched the left rear door and caused it to open but, there being substantial evidence introduced by respondent that this door was not touched, this issue was for the trier of the facts.

We know from common observation and experience that taxicab doors do not fly open while rounding a curve at a reasonable speed if those who have control of the doors have used proper care. The jury could reasonably have believed that either the door latch was defective or that the door was not closed securely.

Since appellant was unable to explain how the door happened to open, the trial court properly denied appellant's motion for a directed verdict and did not err in instructing the jury on *res ipsa loquitur.*

Appellant has cited *Morales v. Employers' Liability Assur. Corp.,* 202 La. 755, 12 So. (2d) 804, as being in sup-

port of his position that *res ipsa loquitur* has no application to the instant case.

In the cited case, the plaintiff, a gratuitous passenger, was sitting jammed in a small space with two other gratuitous passengers beside a side door in the rear part of an ambulance and fell out of this door while the ambulance was proceeding slowly on a straight stretch of road. The driver testified that he had closed the doors tightly himself. The court held that *res ipsa loquitur* was not applicable since the accident happened at a place where the road was smooth and straight and while the ambulance was being driven at a speed which was not excessive. In holding that the doctrine of *res ipsa loquitur* was inapplicable, the supreme court of Louisiana said:

"To render the doctrine applicable in an automobile accident, the accident must be one which ordinarily could not happen except through defects in the car or fault in its operation, or both. But the doctrine applies only where the circumstances leave no room for a different presumption, and it must appear that the probable cause was within the control of the operator of the automobile against whom the doctrine is sought to be invoked. 5 Am. Jur., Automobiles, § 607, p. 839.

"The plaintiff's case is predicated on the proposition that the door of the ambulance, or its lock, was defective, and that the door swung open because of these defects, or because of the negligent operation of the car.

"The facts are that the accident happened at a place where the road was smooth and straight and while the ambulance was being driven at a speed which was not excessive. There was nothing wrong with the door of the ambulance or its lock, and the ambulance was not driven in such a way as to cause the door to swing open. The door could not open except by some person turning its handle either on the inside or on the outside."

This, in substance, was a holding that the accident in that case was one that, in the ordinary course of events, happens without negligence on the part of defendant. In the instant case, none of the occupants of the rear seat was jammed against the left door. There was no testimony as to when or by whom the left rear door was last closed prior to the

accident. Furthermore, the accident occurred when centrifugal force was being applied to the door as the cab made a right turn. In the Louisiana case, the ambulance door opened while it was being driven slowly on a straight road. That case, being distinguishable upon the facts, is not in point.

In *McCormick v. Index Stages,* 137 Wash. 507, 242 Pac. 1090, facts similar to the case at bar appeared. Plaintiff boarded one of defendant's vehicles and took her place upon the right hand side of one of the seats, which ran clear across the car. She sat within a few inches of the door which was to her right. While the bus was making a turn at a speed of seventeen or eighteen miles per hour, the door next to plaintiff opened and she was thrown from her seat, through the open doorway, out onto the ground. The plaintiff testified that she did not touch the door latch at any time. The driver claimed that the door was securely latched, so far as he could see. This court affirmed a judgment in favor of plaintiff. In disposing of defendant's contention that there was a failure of proof of negligence, the court stated:

"The jury might well have believed, from the fact of the door flying open the way that it did upon rounding the corner, that the latch and the catch were mechanically deficient, or that the driver did not completely close and latch the door. . . . We think that, since the jury were warranted by the evidence in believing that either a defect in the latch or a want of effectual use of the latch caused the door to fly open, and it being shown that Mrs. McCormick was injured by reason of the door flying open upon the turning of the corner, there was sufficient [evidence] to warrant the jury in concluding that there was negligence on the part of appellant stage company *approximately* causing Mrs. McCormick's injuries."

It is true that the court in that opinion did not discuss the doctrine of *res ipsa loquitur* as such, but, since there was no effort on the part of respondent to show specific negligence, the court must have based respondent's recovery on this theory. In describing the accident this court said: "Manifestly, it was the centrifugal force, caused by the speed of

the stage and the turn, that caused the door to fly open and Mrs. McCormick to be thrown out."

The next error assigned is the giving of instruction No. 5:

"You are instructed that the negligence, if any, of the minor plaintiff's custodian, Mrs. C. W. Taylor, can not be imputed to the minor plaintiff in this case.

"However, you are instructed that the primary duty of caring for Sharon Clark, the minor plaintiff herein, at the time of the accident, was on Mrs. C. Taylor, the person who, under the undisputed evidence of this case, had the custody of said child.

"You are further instructed that, under these circumstances, the defendant Parkhurst through his employee, the cab driver, had a right to presume and to rely on the presumption that Mrs. Taylor would take care of the child while she was riding in the taxicab as the child's mother would under the circumstances, being prompted by her natural love as a parent.

"However, the cab driver would not be entitled to act upon such presumption if you find that the custodian remonstrated with said child, and that the cab driver assured her that the doors were locked and that it was safe for the child to remain standing."

Appellant first contends that there is no evidence that the driver assured Mrs. Taylor, the custodian, that "it was safe for the child to remain standing." Mrs. Taylor testified:

". . . So Sharon was standing up behind the driver and I asked her to sit down. The cab driver remarked, 'It's all right; the doors are locked.' So I let her stand there."

This testimony was denied by the cab driver.

Mrs. Taylor's testimony, under the circumstances of this case, was sufficient to warrant the giving of instruction No. 5.

Appellant, conceding that the first three paragraphs of instruction No. 5 contain a correct statement of the rule, argues that the last paragraph does not correctly state the applicable rule of law. Appellant contends that the correct statement of the rule, with respect to a common carrier's care of children and liability therefor, is stated in 13 C.J.S., 1291, Carriers, § 694, as follows:

"In respect of a child of tender years, it has been held or recognized that the primary duty of caring for such child is

on the parents or their representative who has the immediate custody of such child, and that, where such child is in the care of his parent, the carrier, through its employees, has the right to rely on the presumption that the parent will take such care of the child as the natural love of the parent would prompt him or her to exercise under the circumstances. Where, however, the carrier's employees who are engaged in the operation of its train know, or, in the exercise of reasonable care and diligence, should know, that such child is or will be exposed to danger or injuries by acts or negligence of the carrier's employees, the carrier is not entitled to act on such presumption and is under the duty to use all reasonable and practicable care and diligence to avoid the danger and avert the injury."

This rule simply means that where a minor child is in the custody of his parent or a custodian, the carrier need not exercise special care with respect to the child.

 However, the fact that the minor child is in a custodian's charge does not absolve the carrier from liability, if the carrier's employees know, or should know, that such child will be injured by certain acts of negligence on their part. As applied to the case at bar, this would mean that since, as the jury apparently found, the driver had assured Mrs. Taylor that it was safe for Sharon to remain standing in the taxicab, appellant could no longer rely on the presumption that Mrs. Taylor would care for the child in the event a rear door opened. This is precisely what the court told the jury in instruction No. 5.

The final assignment of error to be noticed is that the trial court erred in giving the following portion of instruction No. 13 relating to damages:

"With respect to personal injuries, you are instructed that the law fixes no definite amount as compensation for said injuries. It is a matter for the jury to assess after considering all of the facts of the case and the nature and extent of the injuries. With reference to doctors, *X-rays, nursing, medicine and hospital bills* you are instructed that the minor plaintiff is entitled to recover *the reasonable value of such services already rendered* and *the reasonable value of the services she will in the future necessarily require* for such purposes." (Italics ours.)

The only evidence with reference to medical services was that Sharon was taken to the Naval hospital immediately after the accident and again on two occasions during the following week for a few minutes each time. She was never a patient in any hospital. Later, she was taken to Dr. Gross' office in Port Orchard. Dr. Rankin, a specialist in neurology, described his examination of Sharon in his office two months after the accident and expressed his opinion as to her present and future physical condition. He based his opinion upon his own observation of the child during the examination and upon X rays (taken by Dr. Blake) and an electroencephalogram (taken by his own assistant). Dr. Rankin testified that he had charged $125 for this examination of Sharon, including $75 for the electroencephalogram, and that this charge was reasonable.

There is no other evidence in the record showing that any "doctors, X-rays, nursing, medicine and hospital bills" were incurred as a result of this accident or that any would be in the future except Dr. Rankin's recommendation that Sharon's progress be checked by a local physician. Of course, there could be no evidence of the reasonable value of these items since there was no evidence that any of them had been incurred or that there would be any necessity for such medical expenses in the future. It was reversible error, therefore, for the trial court to instruct the jury that the reasonable value of these past and future medical expenses (other than Dr. Rankin's bill) could be taken into consideration in arriving at a verdict.

In *Carr v. Martin,* 35 Wn. (2d) 753, 215 P. (2d) 411, this court recently held that, in the absence of evidence of their reasonable value, it was error for the trial court to submit to the jury claims for such special damages based on medical expenses. If we could determine what allowance for these items was included in the verdict, we might order it reduced to that extent, as we did in the *Carr* case. However, we must assume that the jury followed instruction No. 13, considered the items mentioned therein, and included them in fixing the amount of its verdict ($10,000).

Respondent, citing *Auerbach v. Webb,* 170 Wash. 567, 17 P. (2d) 1, argues that this instruction constituted harmless error. We cannot so regard it. Respondent's complaint alleged that $110 had been incurred for medical expenses and that estimated future expenses would be $500. These allegations being denied, respondent had the burden of proving these items. Since he failed to submit any evidence upon this issue, except to the limited extent above noted, this court cannot speculate as to what amounts the jury included in its verdict of $10,000 for these unproven items.

For this error, we must return the case for a new trial. *Trudeau v. Snohomish Auto Freight Co.,* 1 Wn. (2d) 574, 96 P. (2d) 599.

The judgment appealed from is reversed, and the case remanded with directions to grant appellant a new trial.

SCHWELLENBACH, C. J., BEALS, HILL, and FINLEY, JJ., concur.